## THE QUOGUE.

### NEW YORK, N. H. & H. R. CO. v. LONG ISLAND R. CO.
### THE TRANSFER NO. 12.

### LONG ISLAND R. CO. v. NEW YORK, N. H. & H. R. CO.
#### No. 269.

Circuit Court of Appeals, Second Circuit.
March 2, 1931.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (James McKown, Jr., and Henry M. Hewitt, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The collision occurred about 6:30 a. m. on May 26, 1927, close to the red buoy, referred to in the testimony as the "bug," which is at the entrance to the Greenville Channel. Libelant's steam tug Transfer No. 12 was proceeding with two car floats, made fast one on each side, from Bay Ridge, Brooklyn, to Greenville, N. J. The Quogue, with a car float on her port side, was proceeding down the Greenville Channel bound for Long Island City. When the vessels began to navigate with reference to each other, they were some 2,000 feet apart and in position to pass port to port. The Transfer No. 12 blew a single blast to which the Quogue replied with two. The Transfer thereupon blew the alarm, slowed her engines, and again signaled for a port to port passage. To this second signal the Quogue again blew twice and sounded an alarm. The Transfer's engines were then stopped, and again she blew an alarm and a one-blast signal. The Quogue hauled to port to cross the Transfer's bow, and, although both vessels reversed their engines before the collision, they did so too late to prevent their tows coming into contact. About three or four minutes elapsed between the Transfer's first signal and the collision.

The fault of the Quogue was most glaring. Indeed, she makes no attempt to excuse it, but contends merely that damages should be divided because the Transfer did not stop and reverse more promptly. It is a hard rule which requires a master when he sees another vessel about to cross his bow with wanton disregard of his rights to stop and allow the arrogant usurper to pursue his wrongful course. But safety is better than pride; and, however slight the hope that rules to promote safety will be observed under such circumstances, whatever courts may say, the vessels must be judged according to their legal duties.

When the Transfer's one whistle was crossed for a second time by the Quogue's two, the former's master still assumed that

the Quogue would not carry out the maneuver indicated by her signals unless he consented. He was not justified, however, in acting on that assumption; for, as he testified and as he indicated by blowing alarms, there immediately arose a situation of danger provided the Quogue should proceed to execute, as she shortly did, the maneuver indicated by her signals. His duty as a prudent navigator was not merely to sound the alarm and slow and stop his engines, but to get the way off his vessel as promptly as possible. He did not reverse as promptly as he should. He was not privileged to continue on his course on the chance that the other vessel would change her announced purpose if he refused to consent. It is true that the Pilot Rules (article 18, Rule III, and Inspectors' Rule I) provide only for sounding the danger signal when one vessel fails to understand the course or intention of another which is approaching [1]; but, independently of what the Pilot Rules may require, the courts have very definitely declared that there is a duty to stop and reverse as soon as danger of collision is, seen to exist because of doubt as to what the other vessel may do. The New York, 175 U. S. 187, 201, 20 S. Ct. 67, 44 L. Ed. 126; The Albert Dumois, 177 U. S. 240, 252, 20 S. Ct. 595, 44 L. Ed. 751; The Munaires, 1 F.(2d) 13, 15 (C. C. A. 2); A. H. Bull S. S. Co. v. United States, 34 F.(2d) 614, 616 (C. C. A. 2). However great the temptation of the Transfer's master to refuse to give way to a vessel wantonly insisting on crossing his bow, his duty clearly required him to stop and reverse instead of obstinately insisting on his right to a port to port passage. See The Senator Rice, 223 F. 524, 527 (C. C. A. 2).

The appellee relies upon The Victory and The Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; but there, as stated at page 426 (18 S. Ct. 156), "The Plymothian acted immediately and effectively on hearing the two-blast signal she did hear, and succeeded in stopping her headway." The Bilbster, 6 F.(2d) 954 (C. C. A. 2), is distinguishable because the approaching vessel sheared unexpectedly across the Stavangaren's bow without any previous signal to indicate an intention so to do.

[1] In A. H. Bull S. S. Co. v. United States (C. C. A.) 34 F.(2d) 614, 615, we inadvertently cited the above-mentioned rules as requiring a vessel, in doubt as to the other's course, at once "to blow an alarm and back." The rules do not expressly require more than the alarm. Compare the earlier rule quoted in The Montauk, 180 F. 697, 698 (C. C. A. 2).

Both authority and sound reason require the damages to be divided; but, inasmuch as the fault of the Quogue was so glaring, we shall allow the appellant no costs in this court, although it has prevailed upon the appeal.

The cause is remanded for further proceedings in conformity with this opinion.